## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSLYVANIA

| | | |
|---|---|---|
| ORLANDO BAEZ | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 17-1375 |
| | ) | |
| v. | ) | |
| | ) | |
| DR. BYUNGHAK JIN, DR. MIN HI PARK, | ) | District Judge Cercone |
| DR. PAUL DASCANI, DR. LAURENCE | ) | Magistrate Judge Lenihan |
| ALPERT, ESTHER MATTES, P.A., | ) | |
| ELDON MWAURA, P.A., DR. ROBERT | ) | |
| VALLEY, RICK FRAZER, R.N., | ) | |
| SGT. TERRY HAROUSE, LT. SCOTT | ) | |
| GEORGE, CO. ANGEL BROWN, | ) | ECF Nos. 105, 112, 116 |
| CO. ROBERT DERRY, JOHN AND JANE DOES, | ) | |
| And LOUIS KING, R.N. | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is respectfully recommended that the Motion for Summary Judgment filed by

Defendants Corrections Officer Angel Brown, Corrections Officer Robert Derry, Registered

Nurse Rick Frazer, Lt. Scott George, Sgt. Terry Harouse, and Licensed Practical Nurse Louis

King (ECF No. 105) be granted.  It is further recommended that the Motion for Summary

Judgment filed by Defendant Dr. Robert Valley (ECF No. 112) be granted.  It is also

recommended that the Motion for Summary Judgment filed by Medical Defendants Dr. Laurence

Alpert, Byunghak Jin, M.D., Min Hi Park, M.D., Paul Dascani, M.D., Esther Mattes, P.A., and

Eldon Mwaura, P.A. (ECF No. 116) be granted.

II.     REPORT

Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 alleging that Defendants retaliated against him by failing to provide effective medical care after Plaintiff filed numerous grievances, sick call slips, and other civil actions.

A.     FACTS

The following facts are undisputed unless otherwise indicated and are taken from the parties' Concise Statements of Material Facts, responses thereto, and accompanying appendices.

1.  <u>Defendants CO Angel Brown, CO Robert Derry, Rick Frazer, Lt. Scott George, Sgt. Terry Harouse, and Louis King (collectively "Corrections Defendants")</u>

Plaintiff, Orlando Baez, is an inmate currently incarcerated within the Pennsylvania Department of Corrections (DOC) at the State Correctional Institution at Greene (SCI-Greene). (ECF Nos. 107 & 129 ¶ 1.)  Plaintiff filed Grievance No. 653087 on November 21, 2016, regarding the incident against the Corrections Defendants set forth in the Third Amended Complaint.  (ECF Nos. 107 & 129 ¶ 11.)  Plaintiff complained of the procedures used to insert a catheter and that the procedures caused him excruciating pain and profuse uncontrollable bleeding.  (ECF No. 115 at 75-76.) The DOC investigation into the allegations of Grievance No. 653087 established the following timeline of events:

> On 11/17/16 at approximately 1100hrs, RN Tate and LPN King visited you for nurse line catheter change issues.  At this time, according to your records, you were experiencing catheter pain and pressure.  RN Tate and LPN King stated that they took out the old catheter from 11/16/16 at this time and inserted a new Foley Catheter.  LPN King maintains that he did not "shoot saline directly into the penis" as you claim.  LPN King stated that this is the "numbing" agent used to alleviate some of the pain associated with the insertion.  Upon insertion, LPN King filled the catheter with 30cc of normal saline solution and noted a small blood return which cleared up almost immediately with clear yellow urine.  It is noted that, at this time, you verbalized that pressure was relieved and pain lessened.

>At approximately 1540hrs, a call was received in the medical department by RN Frazer.  He fielded the call and relayed the information to Dr. Valley.  The voiced complaints were of "catheter bothering the inmate."  Based on the provided information, Dr. Valley decided that the catheter would be staying in and it was bothersome because it was a new insertion.  Also at this time, RN Frazer relayed this information to the rest of the medical department staff.

>At approximately 1940hrs, a call was received by the medical department that the inserted catheter was still bothering you.  At this time, RN Frazer relayed to the security personnel that he would only be able to leave the medical department at approximately 2000hrs.  At 2010hrs, RN Frazer arrived on the block to assess your needs and asked you if he could remove the catheter.  At this time, you denied the removal of the catheter and refused to sign the DC-462 Release from Responsibility of Treatment.  RN Frazer then requested to "re-adjust" the catheter and you consented.  Upon deflation of the balloon, RN Frazer observed active bleeding from the penis and activated EMS.   You were sent out to the local ER for evaluation.

>The discharge summary paperwork was reviewed by Dr. Valley the following morning (11/18/16).  According to these papers, there was no definitive answer found for your pain or bleeding.  Your catheter was not reinserted at the hospital and all follow up visits were for wound care purposes with nurse line.  According to your records, no further problems from the catheter have been voiced at this time.

(ECF Nos. 107 & 129 ¶ 15.)

Defendants assert that Plaintiff's medical records do not substantiate that the Corrections Defendants were responsible for improper medical treatment of Plaintiff, but Plaintiff directs the Court to Washington Hospital records which state that "[h]ematuria likely trauma related to repeated foley placement/removal."  (ECF Nos. 107 & 129 ¶ 16 & 126-1 at 2.)

As noted above, at 11:00 a.m. on November 17, 2016, LPN King and RN Tate removed Plaintiff's old catheter due to Plaintiff's complaints of pain and pressure and inserted a new catheter; Plaintiff verbalized that the pain and pressure of which he previously complained had lessened.  (ECF Nos. 107 & 129 ¶ 17.)  The parties dispute, however, the steps taken by LPN

King when changing the Foley catheter. (ECF Nos. 107 & 129 ¶ 19.) Specifically, Plaintiff contends that bleeding started the second LPN King put saline into Plaintiff's urethra and the bleeding never stopped. LPN King asserts that he did not insert saline solution into Plaintiff's urethra, but that a syringe of saline is plugged into the inflation port and pushed to make the balloon inside the bladder inflate such that if the patient tugged on the catheter, it would not come out. (ECF Nos. 107 & 129 ¶ 20 & ¶ 21.) Corrections Defendants further assert that Plaintiff's medical records directly contradict Plaintiff's allegation that he was bleeding "onto the table, clothes and floor," because the Progress Note indicates that there was a small amount of bleeding that then stopped, and clear yellow urine was draining. (ECF No. 107 ¶ 21 & Progress Note of 11/17/16 at 11:00 hr., ECF No. 108 at 60.)

Defendant RN Frazer came to Plaintiff's housing unit later that evening to assess Plaintiff's complaints of a painful Foley. A progress note indicates that Plaintiff had approximately 300cc of blood in his urine bag. Upon attempting to adjust the Foley, Frazer could not control the bleeding that ensued, so Frazer activated EMS for Plaintiff to be taken to the hospital. Plaintiff contends that he was in the triage room bleeding profusely for about 15 to 20 minutes before he was taken to the hospital. (ECF Nos. 107 & 129 ¶ 22 & Progress Note of 11/17/16 22:00 hr., ECF No. 108 at 60.)

Defendants Brown, Derry, George, and Harouse are corrections officers and relied upon Dr. Valley and the Medical Department's assessment that there was no medical emergency. Plaintiff contends, however, that these corrections officers never told medical personnel that Plaintiff was bleeding into the catheter bag. (ECF Nos. 107 & 129 ¶ 24.)

The Initial Review Response to the relevant grievance states as follows:

> Upon investigation of the incident, Medical Administration regrets
> not being on-site at the time of the incident, as they would have

4

> ensured that someone would have been sent over to the housing
> unit to evaluate the initial contact from security.  Dr. Valley was
> instructed that in the future, a nurse should have been sent over for
> the evaluation to maintain a standard quality of care.

(ECF Nos. 107 & 129 ¶ 25.)  On appeal to the Facility Manager of the Initial Review Response,

the Facility Manager noted, "The situation could have been avoided had medical staff responded

when initial contact was made. Your grievance and requested relief is denied in that the situation

was resolved." (ECF Nos. 107 & 129 ¶ 26.)   The grievance investigation noted no conduct by

the corrections officers as being injurious to the Plaintiff or responsible for any adverse action

suffered by the Plaintiff.  (ECF Nos. 107 & 129 ¶ 27.)  The Department's Bureau of Health Care

Services ("BHCS") reviewed Plaintiff's claim of inadequate medical treatment vis-à-vis the

changing of his Foley catheter, and BHCS found no evidence of improper medical care.  (ECF

Nos. 107 & 129 ¶ 28.)

2.    <u>Defendant Dr. Robert Valley</u>

Robert Valley, M.D. ("Dr. Valley") is a licensed physician who worked as the Acting

Medical Director of SCI-Greene from June 2016 through March 2017.  (ECF Nos. 114 & 118 ¶

2.)  Plaintiff suffers from many chronic diseases, including Systemic Lupus Erythematosus

(SLE), Sjogren's syndrome, lymphocytic interstitial pneumonitis, which is a complication of his

SLE, fibromyalgia, osteoporosis, emphysema, pulmonary nodules, glaucoma, right ninth rib

fracture, and lupus dermatitis. (ECF Nos. 114 & 118 ¶¶ 3, 45.)  Plaintiff's medical history also

includes a circumcision, performed on March 11, 2015. Plaintiff's circumcision wound healed

slowly and was treated numerous times as follows:

● On March 12, 2015, Byunghak Jin, M.D. noted that Plaintiff's wound was clean and

dry;

● On March 20, 2015, Dr. Jin noted that the circumcision was healing well. Four stitches were loose and out, and Plaintiff was taping the wound closed himself without complaints of pain;

● On March 27, 2015, Dr. Jin examined Plaintiff's penile shaft and noted wound dehiscence all around with serious drainage, but Plaintiff was not exhibiting signs of infection. Plaintiff's healing was noted to be progressing slowly due to suppressive medication, and it was recommended that Plaintiff's medication be changed and was seen by a urologist;

● On April 1, 2015, Plaintiff complained of his circumcision wound, and Vitamin C was ordered to aid healing;

● On April 3, 2015, Dr. Jin examined Plaintiff's circumcision wound. No signs of infection were noted, and small separation was seen. Plaintiff was scheduled to follow-up with a urologist in four weeks. It was also noted that Plaintiff verbally threatened to sue Dr. Jin;

● On May 1, 2015, Dr. Jin recommended the closure of Plaintiff's dehiscent circumcision wound;

● On May 21, 2015, Plaintiff returned to surgery to re-close his dehiscent circumcision wound and was scheduled for a follow-up in six to eight weeks;

● On July 30, 2015, Plaintiff's circumcision wound was noted as not healing and an ulcer-like lesion was seen around Plaintiff's upper penile area. However, Plaintiff was not exhibiting signs of infection; and

● Plaintiff continued receiving wound care related to his circumcision/penis until at least January 7, 2017.

(ECF Nos. 114 & 118 ¶ 4.)

On June 17, 2016, Dr. Santos evaluated Plaintiff for multiple complaints, including persistent pain on the left side of his face. Plaintiff also threatened Dr. Santos with a lawsuit. Dr. Santos ordered a repeat right rib cage x-ray.  (ECF Nos. 114 & 118 ¶ 5.)  On June 21, 2016, Plaintiff underwent an imagining study of his right ribs. The results of this study, as interpreted by Jerald Hansing, M.D., showed "no evidence of displaced fracture, destructive bony lesion, or other bony abnormality [. . .] pneumothorax, hemothorax, or pulmonary contusion."  (ECF Nos. 114 & 118 ¶ 6.)

Plaintiff alleges that when Dr. Valley first became involved with Plaintiff's case on July 7, 2016, Dr. Valley informed him that his x-rays did not reveal any abnormalities.  (ECF Nos. 114 & 118 ¶ 7.)  Dr. Valley's detailed note does not mention any discussion of an x-ray. Dr. Valley did note, however, Plaintiff's complaints of chronic right neck and shoulder pain affecting his right scapula clavicle, shooting pain down right arm to elbow into fingers, and cramping in both hands. Dr. Valley also noted Plaintiff's complaints of right rib cage pain, which Plaintiff believed to be secondary to medication. The wound on Plaintiff's penis was tender but dry and without drainage. Dr. Valley's plan included a review of Plaintiff's chart and current management.  (ECF Nos. 114 & 118 ¶ 8.)

On July 12, 2016, Dr. Valley assessed Plaintiff's complaints of right arm, shoulder, neck, and chest pain. Dr. Valley further assessed Plaintiff's complaints of abdominal pain and left-sided face pain. Dr. Valley determined that it was unnecessary to send Plaintiff to the emergency department at that time. (ECF Nos. 114 & 118 ¶ 9.)

On July 22, 2016, Plaintiff was evaluated on a sick call. Plaintiff requested to be taken to an emergency department to be evaluated by an "unbiased" physician. It was noted that Plaintiff

was presenting with no indications that would require an emergency department visit. It was ordered that Plaintiff's biweekly visits continue and that he follow-up with various specialists as planned.  (ECF Nos. 114 & 118 ¶ 10.)

On July 27, 2016, Plaintiff was evaluated by Defendant Elon Mwaura, PA-C.  PA Mwaura noted that Plaintiff was voicing no new complaints and still requesting to go to the emergency department. After discussing Plaintiff's condition with the physician, Mwaura noted that they would try to schedule Plaintiff with a rheumatologist sooner, would order a dermatology consultation, and continue biweekly appointments and treatment plan.  (ECF Nos. 114 & 118 ¶ 11.)

On August 4, 2016, Dr. Santos evaluated Plaintiff.  Dr. Santos explained that his CT of the chest and x-ray of the right rib cage did not reveal any pathology of note. Dr. Santos further noted that Plaintiff was "mad/angry and accused me of doing nothing. He wants to go to the ER for immediate tests."  (ECF Nos. 114 & 118 ¶ 12.)

On August 25, 2016, Dr. Valley attended Plaintiff's telemedicine consultation with a dermatologist. Plaintiff was started on Lotrimin and Triamcinolone Cream and given an injection of Methotrexate.  (ECF Nos. 114 & 118 ¶ 13.)  On September 22, 2016, Plaintiff received a Methotrexate injection.  (ECF Nos. 114 & 118 ¶ 14.)

On November 1, 2016, Plaintiff was seen on a sick call visit by Dr. Santos. Dr. Santos noted that Plaintiff was "angry and belligerent" and wanted to be sent to the emergency department for his skin condition secondary to his SLE. Plaintiff refused to allow a nurse to assist him with his dressing changes and stated he would change them himself.  (ECF Nos. 114 & 118 ¶ 15.)  Also, on November 1, 2016, Dr. Valley placed a request for a routine endocrinology appointment, noting that Plaintiff had been on Prednisone therapy for treatment of

his SLE and was subsequently diagnosed with osteoporosis. Plaintiff's osteoporosis was treated with Oscal D, Risedronate, and Alendronate, but he suffered an adverse reaction. It was recommended that Plaintiff receive further evaluation for his osteoporosis.  (ECF Nos. 114 & 118 ¶ 16.)

On November 16, 2016, Plaintiff returned from the wound clinic at Washington Hospital. Dr. Valley requested a follow up would care appointment. (ECF Nos. 114 & 118 ¶ 17.) On November 23, 2016, Dr. Valley administered a Methotrexate injection. On November 26, 2016, Earl Baker, R.N., saw Plaintiff at his cell door for complaints of bleeding from his penis. R.N. Baker noted that there was no active bleeding from the penis, but he nonetheless notified Dr. Valley. Later, on November 26, 2016, Dr. Valley evaluated Plaintiff. Plaintiff informed Dr. Valley that he noticed increased bleeding from his urethra and penile glands. Dr. Valley determined that Plaintiff was suffering from a urethral tear and ordered a urinalysis and urology consult.  (ECF Nos. 114 & 118 ¶¶ 24-27.)

On November 30, 2016, Plaintiff complained of right-sided pain. Later, on November 30, 2016, Dr. Valley ordered Toradol 60mg for Plaintiff's pain. Dr. Valley further ordered a complete blood count, comprehensive metabolic panel, and amylose and lipase testing, as well as imaging to assess Plaintiff's complaints of right-sided chest pain. The results of the chest x-ray that Dr. Valley ordered, as interpreted by Robert Rablea, M.D., showed "no acute bony abnormalities of the chest [or] radiographic evidence of acute pulmonary disease." (ECF Nos. 114 & 118 ¶¶ 28-29.) On November 30, 2016, after seeing Dr. Valley, Plaintiff refused the pain medication and blood work that Dr. Valley ordered.  Plaintiff states that he did not refuse the pain medication and blood work.  (ECF Nos 114 & 118 ¶ 30.)

On December 1, 2016, Plaintiff was examined by Dr. Valley for complaints of right-sided right upper quadrant abdominal pain for the past three days. Dr. Valley determined that Plaintiff required care by an outside facility, ordered his transfer to Washington Hospital, and discussed Plaintiff's condition with the accepting physician, Dr. Amudson.  On December 5, 2016, Plaintiff returned from the hospital. On December 6, 2016, Dr. Valley evaluated Plaintiff. At this time, Plaintiff was still complaining of right-sided chest pain. Dr. Valley determined that Plaintiff's current medication would continue. Also, on December 6, 2016, Plaintiff attended a routine ENT consultation, which was ordered by Dr. Valley. Plaintiff was experiencing increased swelling of the left parotid gland that was reported to be affecting the hearing in his left ear and the vision in his left eye. Due to these reasons, a biopsy was recommended, and ENT was consulted to perform the procedure. Additionally, Dr. Valley ordered the following:

- A pulmonary function test due to Plaintiff's diagnosis of interstitial pneumonia;

- A follow-up CT scan without contrast due to Plaintiff's diagnosis of interstitial pneumonia; and

- A bone scan of the thoracic and cervical spine due to a suspicious lesion and Plaintiff's chronic pain.

(ECF Nos. 114 & 118 ¶¶ 31-34.)

On December 12, 2016, Dr. Valley participated in a telemedicine conference with Plaintiff and a urologist, Paul Shank, M.D., due to urethral bleeding after two Foley catheter insertions more than one week prior. Plaintiff was "very argumentative and agitated before the telemedicine session started." Plaintiff voiced complaints of being in pain and insomnia because he could not take the "crushed pills" that were prescribed due to a neck and throat condition. Dr. Valley explained that crushed pills were a security issue, and that he was unable to provide them

in any other form. Plaintiff was also "very upset" that the medication he was receiving at SCI-Greene was different from what he was receiving at the hospital. Dr. Valley explained that it was equivalent, and Plaintiff again began voicing complaints about receiving crushed pills. Dr. Valley noted that Plaintiff "was also very argumentative with Dr. Shank but he reluctantly agreed to" Dr. Shank's recommendation of a retrograde cystoscopy.  (ECF Nos 114 & 118 ¶ 35.)

On January 7, 2017, Dr. Valley noted that Plaintiff's bone scan of December 1, 2016, suggested bilateral infiltrate. Accordingly, Dr. Valley ordered a chest x-ray and noted that Plaintiff have a follow-up CT scan soon. Dr. Valley further ordered that Plaintiff's Prednisone be resumed, as they gradually tapered the dose down to 15mg per day. Also, on January 7, 2017, Dr. Valley requested a follow-up appointment with the Washington Hospital Wound Care Center. Dr. Valley noted that Plaintiff had been evaluated and treated there previously for a penile wound due to a recent circumcision. The wound was improving from the treatment of collagen, normal saline, and aquacel, but it was nonetheless persisting.  (ECF Nos. 114 & 118 ¶¶ 36-37.)

On January 8, 2017, Dr. Valley met with Plaintiff to inform him that he had ordered an x-ray, CT scan of the chest, pulmonary function test, CT scan of the neck, an appointment for wound care, and consultations with ENT, endocrinology, and osteoporosis. The chest x-ray showed lower left lobe infiltrates, likely due to Plaintiff's lupus, as Plaintiff was not demonstrating any symptoms of pneumonia. Also, on January 8, 2017, Plaintiff underwent a retrograde cystoscopy for hematuria, as recommended by Dr. Shank on December 21, 2016. Additionally, Dr. Valley requested a follow-up CT scan of the neck with contrast for better visualization of Plaintiff's parotid gland, as requested by the ENT.  (ECF Nos. 114 & 118 ¶¶ 38-39.)   On January 11, 2017, Dr. Valley ordered additional chest imaging. The results of this

study, as interpreted by James Zimmerman, M.D., showed that the "bony structures [were] intact." On January 21, 2017, Dr. Valley noted that infiltrate was seen on Plaintiff's left lung base and started him on Levaquin. (ECF Nos. 114 & 118 ¶¶ 40-41.)

On February 2, 2017, William Nicholson, CHCA, performed a chart review. Mr. Nicholson noted that Plaintiff regularly complains that his medical issues are not being addressed, despite his frequent visits with medical providers. According to Mr. Nicholson, "the inmate was stating that he believes we gave him medication that weakened his bones causing painful rib fractures. I tried to explain osteoporosis to him & he interrupted me stating that we are all lieing [sic] to him & he knows we are doing this on purpose." Mr. Nicholson assured him that he was not being lied to and that the information in his chart was accurate. Plaintiff asked if Mr. Nicholson had received his request for a follow up with a new lupus doctor. Plaintiff had received a letter of discontinuing treatment on UPMC letterhead but refused to allow Mr. Nicholson to copy it. Plaintiff also informed Mr. Nicholson that he intended to file a lawsuit if he did not receive a follow-up appointment with another specialist. (ECF Nos 114 & 118 ¶ 42.)

On February 10, 2017, Dr. Valley requested a follow-up pulmonary consultation with Dr. Dendoche at the Washington Hospital due to abnormal results from a recent pulmonary function test. Dr. Valley noted that Plaintiff was recently hospitalized with interstitial lymphocytic pneumonia and found to have multiple pulmonary nodules. These pulmonary nodules were initially thought to be due to a possible malignancy, but after further evaluation, it was determined they were caused by Plaintiff's SLE. (ECF Nos 114 & 118 ¶ 43.)

On February 20, 2017, Dr. Valley ordered a follow-up CT scan of the chest to be completed in six months for further evaluation of Plaintiff's pulmonary nodules. Dr. Valley also ordered a follow-up pulmonary function test. Finally, Dr. Valley re-ordered Plaintiff's

prescription.  (ECF Nos 114 & 118 ¶ 44.)  Thereafter in March 2017, Dr. Valley left SCI-Greene. (ECF Nos 114 & 118 ¶¶ 2 & 44.)

Plaintiff agrees that on average, he was seen every two weeks and sooner when necessary.  (ECF Nos 114 & 118 ¶ 46.)

3.    <u>Defendants Byunghak Jin, MD, Min Hi Park, MD, Paul Dascani, MD, Laurence Alpert, MD, Esther Mattes, PA and Eldon Mwaura, PA (collectively "Medical Defendants")</u>

Baez alleges that in March 2014, he began suffering from subcutaneous skin lupus and systematic lupus skin outbreaks related to severe and excruciating blisters, rashes, sores, lesions, bumps to his groin, buttocks, genitals and spreading to his anus. On July 5, 2014, Dr. Dascani prescribed a hydrocortisone cream to treat Plaintiff's skin lupus outbreaks.  (ECF Nos. 131 & 148-4 ¶ 11.)  As early as July 13, 2014, Plaintiff complained that the cream was not helping with his type of severe lupus skin outbreaks.  (ECF Nos. 131 & 148-4 ¶ 12.)  Plaintiff alleges that Dr. Park disregarded his complaint that the hydrocortisone cream was not working. Baez wished to be prescribed betamethasone instead. Dr. Park prescribed more of the hydrocortisone cream. (ECF Nos. 131 & 148-4 ¶ 13.)  On July 27, 2014, Dr. Park ordered articort cream.  Plaintiff claims that the articort cream caused his condition to worsen.  (ECF Nos. 131 & 148-4 ¶ 14.) Plaintiff contends that Defendants and Dr. Park knew his skin condition was worsening because Plaintiff filed sick call slips, verbally complained, and filed grievances indicating that he could not use the cream.  (ECF Nos. 131 & 148-4 ¶ 15.)  Plaintiff alleges that on August 20, 2014, Dr. Jin told him that he would order the betamethasone skin cream, but Plaintiff states he did not receive it.  (ECF Nos. 131 & 148-4 ¶ 16.)  Plaintiff further alleges that on October 9, 2014, PA Mattes informed Plaintiff that her Supervisor had instructed her to limit Plaintiff's sick call complaints to only one medical issue.  (Third Amended Complaint ECF No. 148-1 ¶ 49.) Similarly, Plaintiff alleges that on November 21, 2014, Dr. Dascani informed Plaintiff that he

would not provide Plaintiff with treatment because Plaintiff was suing Dr. Dascani and other medical staff at SCI Greene.  (Third Amended Complaint ECF No. 148-1 ¶ 56.)  Medical records reflect, however, that Plaintiff was seen and treated on October 12, 13, 17, 20, 21, 23 and 31, 2014 (ECF No. 151 at 64-68), and on November 7, 14, 22 and 24, 2014 (ECF No.151 at 61-63). Plaintiff was also seen on December 3, 4, 5, 12, 14 and 30, 2014, and January 9 and 23, 2015 (ECF No. 151 at 57-60).

On January 27, 2015, Dr. Jin referred Baez to a urologist.  (ECF Nos. 131 & 148-4 ¶ 18.) On February 12, 2015, Plaintiff had his first outside consult with the urologist, Dr. Chaudry. Dr. Chaudry told Baez that his only option to eliminate the damaged skin condition of his foreskin was to undergo a circumcision.  (ECF Nos. 131 & 148-4 ¶ 19.)  Baez alleges that he did not want to have a circumcision.  (ECF Nos. 131 & 148-4 ¶ 20.)  Dr. Chaudry performed the circumcision on March 11, 2015.  (ECF Nos. 131 & 148-4 ¶ 21.)  Baez alleges that by March 12, 2015, all but 2 stitches had come apart causing an open wound on his penis resulting in pain and serious bleeding.  (ECF Nos. 131 & 148-4 ¶ 22.)  On March 15, 2015, Dr. Jin refused to have Baez re-stitched. Baez filed yet more sick call slips and saw Dr. Jin again on March 20, 2015. According to Plaintiff, Dr. Jin supplied Baez with medical tape for his surgical wound and told him not to worry about it. (ECF Nos. 131 & 148-4 ¶ 23.)

On March 26, 2015, Baez returned to Dr. Chaudry for a follow-up visit. Plaintiff alleges that Dr. Chaudry stated that Dr. Jin had waited too long to order Baez' wound re-stitched, and it would take three more weeks for his wound to heal. (ECF Nos. 131 & 148-4 ¶ 24.)

Baez claimed he submitted a sick call request on March 31, 2015 "to no avail." Yet, he saw Dr. Jin on April 3, 2015 at which time Baez claims that Dr. Jin refused to examine his wound.  Plaintiff further complained that he was not seen on the same day he submitted the sick

call slip.  (ECF Nos. 131 & 148-4 ¶ 25.)  Between April 9 and April 23, 2015, Baez submitted more sick call slips and was seen by PA Mattes. Baez claims that PA Mattes refused to examine his wound. (ECF Nos. 131 & 148-4 ¶ 26.)  Baez saw Dr. Chaudry for a scheduled follow-up on April 29, 2015. At that time, Dr. Chaudry told him that the wound would not heal on its own, and he would schedule Baez to be re-stitched at a later time.  (ECF Nos. 131 & 148-4 ¶ 27.)  Baez states that his wounds were re-stitched on May 21, 2015, with no explanation for why it took so long.  Plaintiff claims that the delay lead to various complications including rectal bleeding. (ECF Nos. 131 & 148-4 ¶ 28.)

Plaintiff further alleges that on May 21, 2015, Dr. Jin, after examining Baez, told him that he would give him pain medication. On May 25, 2015, Dr. Jin discontinued the pain medications. On May 27, 2015, Baez met with PA Mattes who indicated that Dr. Jin would extend the prescription for pain medication. According to Baez, PA Mattes did not examine his wound for signs of infection on May 27, 2015.  (ECF Nos. 131 & 148-4 ¶ 29.)

On June 4, 2015, PA Mwaura provided Plaintiff with his lupus injection.  (ECF Nos. 131 & 148-4 ¶ 30.)  Plaintiff states that PA Mwaura did not examine Plaintiff at this time.  (*Id.*) Plaintiff states that three more of his stitches came apart. On June 6, 2015, he was again seen by PA Mattes who said that she could not examine Baez because the prison was on lockdown. (ECF Nos. 131 & 148-4 ¶ 31.)  Baez states that as a result of his condition being ignored, he suffered excruciating pain and a worsening of the symptoms of his skin lupus. (ECF Nos. 131 & 148-4 ¶ 32.)

On June 10, 2015 Baez again saw Dr. Jin. Baez states that Dr. Jin did not examine him. However, by June 12, 2015, Nurse King gave him the betamethasone cream prescribed by Dr. Jin.  Baez further states that Dr. Jin had promised to order the cream on August 20, 2014, and

that Baez waited 14 months to receive it after suffering numerous complications from his lupus.
(ECF Nos. 131 & 148-4 ¶ 33.)

On June 19, 2015, and July 9, 2015, PA Mwaura saw Plaintiff at his cell.  Plaintiff states
that she did not examine him.  (ECF Nos. 131 & 148-4 ¶¶ 34-35.)  On July 20, 2015, PA
Mwaura saw Baez again, this time in response to six (6) sick call slips Baez filed on the same
day. PA Mwaura said that she would not address each slip because they all concerned his lupus.
Plaintiff states that she would not examine him because he filed too may sick call slips.  (ECF
Nos. 131 & 148-4 ¶ 36.)  Medical records reflect that Plaintiff was treated every two weeks for
his chronic conditions and that Baez was directed to use the sick call slips for new medical
issues.  (*See, e.g.*, ECF No. 151 at 4.)

On July 22, 2015, Baez was again sent out to see Dr. Chaudry, the urologist. Instead, he
was seen by Dr. Cohen. Dr. Cohen noted a half-inch long wound on Baez' penis. Dr. Cohen took
pictures of the wound. Baez complained to Dr. Cohen of pain and problems urinating.  (ECF
Nos. 131 & 148-4 ¶ 37.)  Baez submitted several sick call slips and was seen by a non-defendant
physician assistant (PA) from the end of July through August of 2015.  On August 27, 2015,
Baez saw PA Mwaura who only examined the swelling and infection on Baez' left side.
According to Plaintiff, he was told that Dr. Jin would see him on September 5, 2015, but he was
not seen by anyone that day.  (ECF Nos. 131 & 148-4 ¶¶ 38-40.)  On September 10, 2015, Baez
saw PA Mwaura who gave him his lupus injection and said she was not there to examine his
wound.  (ECF Nos. 131 & 148-4 ¶ 41.)

On May 29, 2016, Baez began to experience several symptoms, including sores on his
back, coughing, burning in his throat and swelling in his neck and throat. By June 2, 2016, Baez
was unable to get out of bed. Plaintiff alleges that on that day, he was seen by PA Mwaura in the

16

triage room. PA Mwaura gave him his lupus injection but refused to do anything else for him. (ECF Nos. 131 & 148-4 ¶ 42.)

From June 8, 2016 through June 21, 2016, Plaintiff was treated by other medical personnel not named in the Third Amended Complaint.  Plaintiff was complaining of deep sharp piercing pain to the right side of his rib cage.  This treatment included x-rays which showed that he had no internal injuries or broken/fractured ribs.  (Third Amended Complaint, ECF No. 34 ¶¶ 145-153.)

On December 1, 2016, Baez was transported to the emergency room at the "Southwest Medical Regional Center Hospital." There, he was x-rayed and sent on to Washington Hospital. Plaintiff alleges that "something on the right side of [his] ribcage and lung was developing" as a direct result of the medication Risedronate.  Plaintiff contends that as a result of the Risedronate, he sustained two (2) fractured ribs. (ECF Nos. 131 & 148-4 ¶ 44.)

Plaintiff's medical records reflect that he was seen every two weeks regardless of his complaints, and when he had complaints, even more frequently.  He was also receiving injections ordered by his lupus specialists from the University of Pittsburgh on a regular basis. (*See* ECF Nos 116-8 through 116-9; *see also* Third Amended Complaint, ECF No. 34.)

B.    LEGAL STANDARD

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear the burden of proof at

trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact; that is, the movant must show that the evidence of record is insufficient to carry the non-movant's burden of proof. *Id.* Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis added by *Matsushita* Court). An issue is genuine only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986). In *Anderson*, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249-50 (internal citations omitted).

C.    ANALYSIS

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

18

42 U.S.C. § 1983. To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

<u>RETALIATION</u>

Retaliation for the exercise of a constitutionally protected activity is a violation of rights secured by the Constitution, and therefore cognizable under § 1983. *Rauser v. Horn*, 341 F.3d 330 (3d Cir. 2001); *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990). Merely alleging retaliation is insufficient to prevail on a claim of retaliation; instead a plaintiff bears the burden of satisfying three elements. First, a prisoner-plaintiff must prove that he engaged in a constitutionally protected activity. *Rauser*, 241 F.3d at 333. Second, a prisoner-plaintiff must demonstrate that he "suffered some 'adverse action' at the hands of prison officials." *Id.* (quoting *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000)). A prisoner satisfies this element by showing adverse action "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Id.* Third, a prisoner-plaintiff must prove that his constitutionally protected conduct was a substantial or motivating factor in the defendants' conduct. *Rauser*, 241 F.3d 333-34 (adopting *Mount Healthy Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). The mere fact that an adverse action occurs after a complaint or grievance is filed is relevant, but not dispositive, for the purpose of establishing a causal link between the two events. *See Lape v. Pennsylvania*, 157 F. App'x 491, 498 (3d Cir. 2005) (citing *Robinson v. City of Pittsburgh*, 120

F.3d 1286, 1302 (3d Cir. 1997) ("instructing that if 'timing alone' is the evidence adduced to establish the element of causation in a retaliation claim, the facts must be 'unusually suggestive' of retaliatory motive")).  More specifically, the crucial third element of causation requires a plaintiff to prove either an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or a pattern of antagonism coupled with timing to establish a causal link.  *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Once a plaintiff has made out a prima facie case, the burden shifts to the defendants to prove by a preponderance of the evidence that they "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest."  *Carter v. McGrady*, 292 F.3d 152, 158 (3d Cir. 2002) (internal quotation and citation omitted).

    1.  <u>Defendants CO Angel Brown, CO Robert Derry, Rick Frazer, Lt. Scott George, Sgt. Terry Harouse, and Louis King (Corrections Defendants)</u>

In support of their Motion for Summary Judgment, the Corrections Defendants argue that medical records and other documentary evidence do not support Plaintiff's assertions of adverse actions.  These Defendants further argue that even if Plaintiff raises an issue of material fact as to whether he suffered an adverse action, Plaintiff has failed to come forward with evidence to raise a disputed issue of material fact that any alleged adverse action was motivated by Plaintiff's constitutionally protected conduct.  (Brief in Support of Motion for Summary Judgment, ECF No. 106 at 6-15.)  Plaintiff responds that he has raised a disputed issue of material fact that he sustained adverse actions at the hands of the Corrections Defendants, and that there can be no other reason for these alleged adverse actions other than retaliation.

Defendants concede that Plaintiff engaged in constitutionally protected conduct when he filed grievances against the medical department. *See, e.g., Booth v. King*, 346 F. Supp. 2d 751, 762 (E.D. Pa. 2004); *Allah v. Al-Hafeez*, 208 F. Supp. 2d 520 (E.D. Pa. 2002) (filing of grievances is protected under the First Amendment right to petition the government for redress of grievances).

As to the second prong of the *Rauser* test, Plaintiff's medical records no not support Plaintiff's claim that he suffered an adverse action in the form of improper medical care. Instead, the record reflects Plaintiff's serious and complicated medical conditions that were consistently addressed by medical personnel between 2014 and 2017.  While Plaintiff may have not been satisfied with the medical care and/or lack of successful medical treatment he received, and while Defendants may have been incorrect in their medical judgment at times, Plaintiff has simply not established that the Corrections Defendants' actions were at any time adverse.  For instance, Plaintiff's allegations against RN King are not supported by the medical records and the investigation to respond to the grievance.  Following the insertion of the new catheter by RN Tate and LPN King, Plaintiff stated that the pain and pressure had lessened.  Nor do the records support Plaintiff's assertion that he was bleeding "onto the table, clothes and floor," because the progress note indicates that there was a small amount of bleeding that then stopped, and clear yellow urine was draining.

As to Corrections Defendants Brown, Derry, George, and Harouse, none of them are medical professionals and are justified in relying upon the information communicated to them from medical personnel.  *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

Finally, Defendant Frazer immediately contacted EMS when later that evening he could not stop the bleeding after he attempted, with Plaintiff's permission, to adjust Plaintiff's catheter.

Plaintiff has thus failed to show an adverse action sufficient to deter a person of ordinary firmness from exercising a personal constitutional right. *See Rauser*, 241 F.3d at 333.

Even if Plaintiff has raised an issue of material fact as to whether his medical care was adverse, he has failed to carry his burden of coming forward with evidence to raise a disputed issue of material fact that Plaintiff's constitutionally protected conduct was a substantial or motivating factor in Defendants' decision to take the allegedly adverse action.  Plaintiff simply asserts that there can be no other reason for the inadequate medical care he allegedly received.  It is Plaintiff's burden, however, to come forward with evidence to raise a disputed issue of material fact that the Corrections Defendants were motivated by retaliation.  *See Rauser,* 241 F.3d at 333-34.  Plaintiff does not direct the Court to any prior grievances filed against these specific Defendants.  In fact, the Court's review of all record grievances reveals that none of the Corrections Defendants are named in the grievances other than the one relating to the facts alleged against these Defendants in the Third Amended Complaint at Grievance No. 653087. Plaintiff has submitted 142 sick call slips, none of them specifically directed to the Corrections Defendants around or near the time of the events in issue.  Moreover, Plaintiff has not directed the Court to specific previous litigation directed against any of the Corrections Defendants.

Plaintiff has also failed to come forward with evidence to show either an unusually suggestive temporal proximity between his protected activity and the allegedly adverse action, or a pattern of antagonism coupled with timing to establish a causal link.  The Court cannot reasonably infer that Plaintiff's frequent medical requests, complaints and criticisms influenced the Corrections Defendants' actions in the delivery of medical care and attention to Plaintiff.  On this record, no reasonable jury could conclude that the quality of Plaintiff's medical care was in

retaliation for Plaintiff's exercise of his First Amendment rights.  Therefore, it is recommended that the Corrections Defendants' Motion for Summary Judgment be granted.

2.      Dr. Valley

Defendant Dr. Valley argues that Plaintiff has failed to come forward with record evidence to raise an issue of material fact that Dr. Valley retaliated against him.  Plaintiff responds that there is simply no other reason for the actions of Dr. Valley other than retaliation.

Defendant concedes that the filing of both lawsuits and grievances are protected activities for purposes of retaliation and that therefore, Plaintiff has satisfied the first prong of the *Rauser* test.

As to the second prong, Plaintiff has not established that the medical treatment he received from Dr. Valley was adverse.  Plaintiff alleges that practically all the care he either received or did not receive for his SLE, penile wound, and rib pain was done out of retaliation for filing lawsuits and grievances.  Facts of record, however, establish that Dr. Valley, as Acting Medical Director from June 2016 through March 2017, ordered extensive tests, consultations, imaging studies, medications and follow-up care.  Plaintiff's dissatisfaction with the care he received for his serious and complicated medical issues does not establish that his care was adverse.  Instead, Plaintiff's medical records show that Dr. Valley continued to provide medical care to Plaintiff even after Plaintiff threatened others with lawsuits and even after Plaintiff complained on a sick call sick that Dr. Valley was not qualified to treat his lupus.

Relatedly, Dr. Valley's consistent and appropriate medical care in close proximity to Plaintiff's complaints in sick call slips, grievances, and threats to file civil lawsuits negates any unusually suggestive temporal proximity between Plaintiff's protected activity and the allegedly retaliatory action.  Dr. Valley's consistent medical care also negates any pattern of antagonism

coupled with timing to establish a causal link. That is, Plaintiff has failed to demonstrate that the exercise of his protected rights influenced the medical treatment he received from Dr. Valley.

Therefore, it is recommended that Dr. Valley's Motion for Summary Judgment be granted.[1]

3.  Defendants Dr. Laurence Alpert, Byunghak Jin, M.D., Min Hi Park, M.D., Paul Dascani, M.D., Esther Mattes, P.A., and Eldon Mwaura, P.A. (Medical Defendants)

In support of their Motion for Summary Judgment, the Medical Defendants argue that record evidence defeats Plaintiff's claim for retaliation because medical records show that Plaintiff's medical care was not adverse. Moreover, the Medical Defendants argue that even if Plaintiff raises a disputed issue of fact that his medical care was adverse, Plaintiff cannot show that the exercise of his constitutionally protected conduct was a substantial or motivating factor in the Medical Defendants' conduct. Plaintiff responds that the Medical Defendants denied him effective medical care and prohibited him from filing grievances.

Plaintiff has established that he has engaged in constitutionally protected activity in the filing of grievances. The record reflects that from July 2014 through July 2016, Plaintiff filed 21 grievances against various Medical Defendants. In fact, Plaintiff was placed on "grievance restriction" pursuant to DOC policy for 90 days from January 14, 2015 to April 14, 2015. During this time, he was permitted to submit one (1) grievance every 15 working days.[2] Record evidence also reflects 142 pages of sick call slips. Plaintiff has satisfied prong one of the *Rauser* test.

---

[1] Dr. Valley also argues that even if Plaintiff had succeeded in shifting the burden of proof, Dr. Valley would nonetheless prevail because he can demonstrate that he made sound medical decisions, and therefore, would have made the same medical decisions absent the protected conduct. *See* Carter, 292 F.3d at 158. The Court finds that evidence of record supports Dr. Valley's argument.

[2] *See* DC-ADM 804, Section VI. D ("an inmate who files 5 frivolous grievances within a 30-day period may be restricted to filing no more than one grievance each 15 working days. . . . . An inmate may be placed on grievance restriction for a maximum of 90 days. An inmate may appeal a grievance restriction to the Facility Manager.")

As to prong two, Plaintiff has failed to come forward with evidence to raise a disputed issue of material fact that he suffered an adverse action.  Plaintiff's contention that the Medical Defendants denied him medical care and treatment is rebutted by the record. The record reflects that Plaintiff's sick call slips and grievances indicate Plaintiff's dissatisfaction with Defendants' delivery of medical treatment for his serious and complex medical issues. The records also indicate that Plaintiff received extensive medical care, including being sent out of the institution for medical treatment on more than one occasion.  Plaintiff comes forward with no evidence to suggest that Defendants continued to pursue a course of treatment they knew to be ineffective or withheld necessary medical treatment that they knew to be more effective.  Despite repeated attempts to alleviate Plaintiff's pain, Plaintiff continually and systematically complained that he failed to obtain relief.  These complaints included threats to file civil actions.  Yet, the Medical Defendants continued to treat Plaintiff on a regular basis and routinely sent him out of the DOC facility for consultations with specialists, tests, imaging and other medical procedures.  The Court is sympathetic to Plaintiff's situation and the many chronic conditions that he must live with on a daily basis, but the record reflects no evidence to suggest that the Medical Defendants denied Plaintiff medical care for his serious medical needs.

Moreover, Plaintiff has failed to come forward with evidence to raise an issue of material fact that Defendants' alleged misconduct was motivated by Plaintiff's exercise of his First Amendment rights in filing grievances, sick call slips and other civil actions.  Plaintiff has failed to establish a timeline between the grievances/civil actions he filed against each individual medical defendant, and the retaliatory act that ensued such that the Court might evaluate the temporal proximity between the protected activity and the allegedly retaliatory action.  Likewise, he has failed to direct the court to a pattern of antagonism coupled with timing to establish a

causal link.  Instead, records show that Plaintiff was receiving medical care before, during and after his filing of grievances. Plaintiff has failed to raise an issue of material fact as to the third prong of the *Rauser* test.  Plaintiff cannot establish a claim for retaliation simply by stating that he engaged in protected conduct and thereafter, received what he perceived to be inadequate medical care.

Finally, Plaintiff argues that imposition of the grievance restriction between January 14, 2015 and April 14, 2015 was in retaliation for Plaintiff's exercise of his First Amendment rights and the Medical Defendants' desire to silence him.  Plaintiff's argument necessarily fails because established DOC policy provided for this limitation for reasons reasonably related to penological interests.  *See Carter*, 292 F.3d at 158.  Plaintiff has not sustained his burden under *Rauser* and it is therefore recommended that summary judgment be granted in favor of the Medical Defendants.

III.     CONCLUSION

It is respectfully recommended that the Motion for Summary Judgment filed by Defendants Corrections Officer Angel Brown, Corrections Officer Robert Derry, Registered Nurse Rick Frazer, Lt. Scott George, Sgt. Terry Harouse, and Licensed Practical Nurse Louis King (ECF No. 105) be granted.  It is further recommended that the Motion for Summary Judgment filed by Defendant Dr. Robert Valley (ECF No. 112) be granted.  It is also recommended that the Motion for Summary Judgment filed by Medical Defendants Dr. Laurence Alpert, Byunghak Jin, M.D., Min Hi Park, M.D., Paul Dascani, M.D., Esther Mattes, P.A., and Eldon Mwaura, P.A. (ECF No. 116) be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. §636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

Dated: January 29, 2020

BY THE COURT

LISA PUPO LENIHAN
United States Magistrate Judge

Cc: Orlando Baez
CB 3721
1200 Mokychic Drive
SCI Phoenix
Collegeville, PA 19426